# EXHIBIT A

**File By Fax**

FILED
SAN MATEO COUNTY

SEP 2 0 2017

Clerk of the Superior Court.

_____ CLERK

1  ROBBINS GELLER RUDMAN
&  DOWD LLP
2  JAMES I. JACONETTE (179565)
655 West Broadway, Suite 1900
3  San Diego, CA  92101
Telephone:  619/231-1058
4  619/231-7423 (fax)

5  Attorneys for Plaintiff

6  [Additional counsel appear on signature page.]

7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF SAN MATEO

10  LAURENCE CLAYTON, Individually and on  )   **VIA FAX**
   Behalf of All Others Similarly Situated,  )
11                                           )   Case No.   **17 C I V 0 4 3 1 2**
                        Plaintiff,           )
12                                           )   CLASS ACTION
         vs.                                 )
13  TINTRI, INC.,                            )   COMPLAINT FOR VIOLATIONS OF THE
    KEN KLEIN,                               )   FEDERAL SECURITIES LAWS
14  IAN HALIFAX,                             )
    JOHN BOLGER,                             )
15  CHARLES GIANCARLO,                       )
    ADAM GROSSER,                            )
16  KIERAN HARTY,                            )
    HARVEY JONES,                            )
17  CHRISTOPHER SCHAEPE,                     )
    PETER SONSINI,                           )
18  NEW ENTERPRISE ASSOCIATES 12,            )
       LIMITED PARTNERSHIP,                  )
19  NEA PARTNERS 12, LIMITED                 )
       PARTNERSHIP,                          )
20  NEA 12 GP, LLC,                          )
    SILVER LAKE KRAFTWERK FUND, L.P.,        )
21  SILVER LAKE GROUP, L.L.C.,               )
    SILVER LAKE TECHNOLOGY                   )
22     ASSOCIATES KRAFTWERK, L.P.,           )
    MORGAN STANLEY & CO. LLC,              TI)
23  MERRILL LYNCH, PIERCE, FENNER &          )
       SMITH INCORPORATED,                   )
24  KEYBANC CAPITAL MARKETS, INC.,           )
    CREDIT SUISSE SECURITIES (USA) LLC,      )
25  NEEDHAM & COMPANY, LLC,                  )
    PIPER JAFFRAY & CO,                      )
26  _____     )   DEMAND FOR JURY TRIAL

27  [Caption continued on following page.]

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  RAYMOND JAMES & ASSOCIATES, INC., )
   WILLIAM BLAIR & COMPANY, L.L.C. and )
2  DOES 1-25, inclusive,                )
                                        )
3                          Defendants.  )
                                        )
4  _____)

1    Plaintiff Laurence Clayton ("plaintiff"), individually and on behalf of all others similarly
2 situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the
3 following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information
4 and belief as to all other matters based on the investigation conducted by and through plaintiff's
5 attorneys, which included, among other things, a review of Tintri, Inc.'s ("Tintri" or the "Company")
6 press releases, U.S. Securities and Exchange Commission ("SEC") filings, conference call transcripts,
7 analyst reports, media reports, and other publicly disclosed reports and information about defendants.
8 Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a
9 reasonable opportunity for discovery.

10                              **NATURE OF THE ACTION**

11    1.    This is a securities class action on behalf of all those who purchased Tintri common
12 stock pursuant or traceable to Tintri's June 30, 2017 initial public stock offering (the "IPO"), seeking to
13 pursue remedies under the Securities Act of 1933 (the "1933 Act").

14                              **JURISDICTION AND VENUE**

15    2.    The claims alleged herein arise under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C.
16 §§77k, 77l(a)(2) and 77o. Jurisdiction is conferred by §22 of the 1933 Act and venue is proper pursuant
17 to §22 of the 1933 Act. Section 22 of the 1933 Act explicitly states that "[e]xcept as provided in section
18 16(c), no case arising under this title and brought in any State court of competent jurisdiction shall be
19 removed to any court of the United States." Section 16(c) refers to "covered class actions," which are
20 defined as lawsuits brought as class actions or brought on behalf of more than 50 persons asserting
21 claims under state or common law. This is an action asserting federal law claims. Thus, it does not fall
22 within the definition of a "covered class action" under §16(b)-(c) and *is therefore is not removable to*
23 *federal court,* under the Securities Litigation Uniform Standards Act of 1998 or otherwise. *See Luther*
24 *v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789, 792 (2011) ("The federal Securities Act of 1933 . . . ,
25 as amended by the Securities Litigation Uniform Standards Act . . . , provides for *concurrent*
26 *jurisdiction* for cases asserting claims under the 1933 Act . . . ."); *Luther v. Countrywide Home Loans*
27 *Servicing LP*, 533 F.3d 1031, 1032 (9th Cir. 2008) ("Section 22(a) of the Securities Act of 1933 creates
28 concurrent jurisdiction in state and federal courts over claims arising under the Act. It also specifically

1   provides that such claims brought in state court are not subject to removal to federal court."); *Plymouth*
2   *Cty. Ret. Sys. v. Model N, Inc.*, No. 14-cv-04516-WHO, 2015 U.S. Dist. LEXIS 1104, at *8 (N.D. Cal.
3   Jan. 5, 2015) ("Since 2013, . . . *every court* in this district to [adjudicate a motion to remand an action
4   brought in state court pursuant to the 1933 Act] *has granted remand*.").

5          3.     The violations of law complained of herein occurred in this State and in large part in this
6   County. More Individual Defendants reside in San Mateo County than any other location. Individual
7   Defendants Klein (Tintri's Chief Executive Officer ("CEO")), Bolger, Giancarlo, Grosser and Sonsini
8   (defined below) reside in San Mateo County, the Venture Capital Defendants operate out of their offices
9   in San Mateo County, and each of the Underwriter Defendants (defined below) has a sizable San Mateo
10  County practice and maintains substantial and continuous contact with California by conducting
11  significant investment banking operations in this County and throughout this State.

12                                          **PARTIES**

13         4.     Plaintiff Laurence Clayton purchased Tintri common stock pursuant and traceable to the
14  IPO, and was damaged thereby.

15         5.     Defendant Tintri is an information technology company in the United States and
16  distributes products designed for Enterprise Cloud, virtual machines and containers.

17         6.     Defendant Ken Klein ("Klein") is, and was at the time of the IPO, Tintri's CEO and
18  Chairman of the Board of Directors.

19         7.     Defendant Ian Halifax ("Halifax") is, and was at the time of the IPO, Tintri's Chief
20  Financial Officer ("CFO").

21         8.     Defendants John Bolger ("Bolger"), Charles Giancarlo ("Giancarlo"), Adam Grosser
22  ("Grosser"), Kieran Harty ("Harty"), Harvey Jones ("Jones"), Christopher Schaepe ("Schaepe") and
23  Peter Sonsini ("Sonsini") are, and were at the time of the IPO, members of the Tintri Board of
24  Directors.

25         9.     The defendants referenced above in ¶¶6-8 signed the false and misleading Registration
26  Statement used to conduct the IPO and are referred to herein as the "Individual Defendants." The
27  defendants referenced above in ¶¶6-7 are executives of Tintri are sometimes referred to herein as the

28

1   "Executive Defendants." Defendant Tintri and the Individual Defendants are strictly liable for the false
2   and misleading statements in the Registration Statement.

3         10.     Defendants New Enterprise Associates 12, Limited Partnership, NEA Partners 12,
4   Limited Partnership and NEA 12 GP, LLC (collectively, the "NEA Defendants") are part of New
5   Enterprise Associates, a venture capital firm that invested in Tintri before the IPO and beneficially
6   owned at the time of the IPO approximately 5.3 million shares or over 23% of the Company's shares.
7   The NEA Defendants were the largest shareholders in the Company as of the IPO. NEA Partners 12,
8   Limited Partnership is and was at the time of the IPO, the sole general partner of New Enterprise
9   Associates 12, Limited Partnership and NEA 12 GP, LLC, and the NEA Defendants shared voting and
10   dispositive control over the shares held by New Enterprise Associates 12, Limited Partnership. Those
11   shares controlled by the NEA Defendants, Series A-D, E-2, and F-2 convertible Preferred Stock,
12   automatically converted into publicly tradable common stock immediately prior to the closing of the
13   IPO, on a one-to-one basis with respect to the Series A-D shares and on a one-to-1.68214 basis with
14   respect to the Series E-2 and F-2 shares. Defendant Sonsini is a General Partner at New Enterprise
15   Associates and head of the NEA Defendants' Enterprise practice group. He represents the NEA
16   Defendants' interests as a member of Tintri's Board of Directors. As a result of the NEA Defendants'
17   holdings, influence through share purchase agreements and through participation in management
18   decision-making on significant matters leading up to the IPO as well as by having a director on Tintri's
19   Board of Directors, the NEA Defendants effectively controlled Tintri and caused it to conduct the IPO.

20         11.     Defendants Silver Lake Kraftwerk Fund, L.P., Silver Lake Group, L.L.C. and Silver
21   Lake Technology Associates Kraftwerk, L.P. (collectively, the "Silver Lake Defendants") are part of a
22   venture capital firm that invested in Tintri before the IPO and beneficially owned at the time of the IPO
23   approximately over 4.5 million shares or approximately 21% of the Company's shares. Silver Lake
24   Group, L.L.C. is the managing member of the general partner of the general partner of Silver Lake
25   Kraftwerk Fund, L.P., and Silver Lake Technology Associates Kraftwerk, L.P. is the general partner of
26   Silver Lake Kraftwerk Fund, L.P., and as such these defendants share voting and dispositive power over
27   the shares held by Silver Lake Kraftwerk Fund, L.P. and Silver Lake Technology Investors Kraftwerk,
28   L.P. Those shares controlled by the Silver Lake Defendants, Series F convertible Preferred Stock,

1  automatically converted into publicly tradable common stock immediately prior to the closing of the
2  IPO, on a 2.9999959-for-1 basis.  Defendant Grosser is the Group Head and Managing Director of
3  Silver Lake Kraftwerk.  He represents the Silver Lake Defendants' interests as a member of Tintri's
4  Board of Directors.  As a result of the Silver Lake Defendants' holdings, influence through share
5  purchase agreements and through participation in management decision-making on significant matters
6  leading up to the IPO as well as by having a director on Tintri's Board of Directors, the Silver Lake
7  Defendants effectively controlled Tintri and caused it to conduct the IPO.

8       12.     The defendants referred to in ¶¶10-11 are sometimes referred to as the "Venture Capital
9  Defendants."

10      13.     Defendants Morgan Stanley & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith
11  Incorporated, KeyBanc Capital Markets, Inc., Credit Suisse Securities (USA) LLC, Needham &
12  Company, LLC, Piper Jaffray & Co., Raymond James & Associates, Inc. and William Blair &
13  Company, L.L.C. are investment banking firms that acted as underwriters of the IPO, helping to draft
14  and disseminate the IPO documents.  These defendants are referred to herein as the "Underwriter
15  Defendants."  Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and
16  misleading statements in the Registration Statement because the Underwriter Defendants are investment
17  banking houses which specialize, *inter alia*, in underwriting public IPOs of securities.  They served as
18  the underwriters of the IPO and shared fees collectively and caused the Registration Statement to be
19  filed with the SEC and declared effective in connection with offers and sales thereof, including to
20  plaintiff and the Class (as defined below).

21      14.     Under the terms and subject to the conditions contained in an underwriting agreement,
22  the underwriters named above, for whom Morgan Stanley & Co. LLC and Merrill Lynch, Pierce,
23  Fenner & Smith Incorporated are acting as representatives, severally agreed to purchase, and will agree
24  to sell to them, severally, the number of shares of common stock indicated below:

25
26
27
28

| Underwriters | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 4,286,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 1,714,400 |
| Pacific Crest Securities, a division of KeyBanc Capital Markets, Inc. | 857,200 |
| Needham & Company, LLC | 428,600 |
| Piper Jaffray & Co. | 428,600 |
| Raymond James & Associates, Inc. | 428,600 |
| William Blair & Company, L.L.C. | 428,600 |
| **Total** | **8,572,000** |

15. Further, Tintri granted to the underwriters an option, exercisable for 30 days from the date of the IPO, to purchase up to 1,285,800 additional shares of common stock at $7 per share, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the shares of common stock offered by the IPO. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional shares of common stock as the number listed next to the underwriter's name in the preceding table bears to the total number of shares of common stock listed next to the names of all underwriters in the preceding table.

16. The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who therefore sues these defendants by such fictitious names. Plaintiff will seek to amend this complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Class.

**SUBSTANTIVE ALLEGATIONS**

17. Tintri is an emergent growth technology company that was founded in 2008 and introduced products in March 2011. The Company focuses on serving large private and public sector organizations and cloud service providers, or CSPs, and stated that it had more than 1,300 customers as of April 30, 2017. The Company specializes in the development and marketing of enterprise cloud platforms that combine cloud management software technology and a range of all-flash storage systems

1   for virtualized and cloud environments.  The Company operates throughout the United States and
2   internationally.

3        18.     On or about June 1, 2017, Tintri filed with the SEC its registration statement on Form
4   S-1 (Registration No. 333-218429), which was amended and later declared effective by the SEC (the
5   "Registration Statement").  On June 30, 2017, the Company filed its Form 424B4 Prospectus.

6        19.     The Company's initial plan was to raise $100 million in gross proceeds in its IPO by
7   selling 8.7 million shares at a midpoint price of $11.50 per share.  Just hours before its IPO was to take
8   place, however, the Company delayed its IPO for a day, and significantly paired back the offering,
9   ultimately priced at $7.00 per share.  Further, Tintri reduced the number of shares being offered to 8.5
10   million from 8.7 million shares, which meant it would raise roughly $53.8 million in net proceeds, and
11   the Company would not be able to raise the $87.5 million its initial offering had sought.

12        20.     The IPO was successful for the Company and the Underwriter Defendants who sold
13   8,572,000 million shares of Tintri common stock to the investing public, raising $60 million in gross
14   proceeds as of the closing of the IPO on July 6, 2017, and who sold an additional 1,000,000 shares of
15   Tintri common stock to the investing public at a second closing on August 1, 2017, raising an additional
16   $7 million in gross proceeds pursuant to the Underwriter Defendants' green shoe agreement with the
17   Company.

18        21.     According to the Prospectus, the Company's mission is to provide large organizations
19   and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside
20   their own data centers and that can also connect to public cloud services.  The Company also helps
21   customers optimize infrastructure by significantly simplifying deployment and operations, which can
22   lead to substantial reductions in capital expenditures and operating expenses.

23        22.     In its Prospectus, Tintri stated that it had experienced rapid growth in recent quarters and
24   that the Company's top 25 long-term customers cumulatively have ordered more than 19 times the
25   amount they ordered in their first quarter as a customer and that the Company planned "to continue to
26   focus on acquiring customers and maximizing their lifetime value through our demonstrated land-and-
27   expand strategy."  The Prospectus further outlined the Company's growth strategy for after the
28   completion of the IPO, stating, in pertinent part, as follows:

**Our Growth Strategy**

We intend to extend our position as a leader in providing enterprise cloud solutions to large organizations and CSPs. Key elements of our growth strategy include:

*       *       *

• **Pursue Additional Large Organizations and CSPs.** We intend to continue our sales efforts to further penetrate the Global 2000 enterprises and CSPs with the most demanding workloads and complex cloud requirements.

*       *       *

• **Increase Sales to Installed Base.** We intend to continue expanding our footprint with our existing customers by supporting additional use cases and selling additional software products. These additional use cases include data protection and disaster recovery, to expand our total addressable market.

*       *       *

• **Expand and Deepen Technology Partnerships and Integrations.** We intend to expand and deepen our relationships with leading technology companies. We expect to continue to work closely with our partners to achieve certifications and integrations as well as to seek additional partnerships that will allow us to address new customer use cases and deployments.

23.     The Prospectus detailed Tintri's competitive strengths in the information technology industry, stating, in pertinent part, as follows:

• **Our Customers Purchase Our Software Products Incrementally. Our customers may** buy software products incrementally or as part of a suite on an as-needed basis and tailor their solutions to their specific enterprise environment requirements. We believe that by offering our customers this flexibility, we provide them with differentiated value, thereby enabling us to drive incremental product sales.

*       *       *

• **We Successfully Sell Enterprise Cloud to Large Organizations and CSPs.** We sell to a growing list of large organizations and CSP customers. Our value proposition to these customers is particularly compelling given that these organizations have large data centers with complex requirements and can benefit the most from self-service, automated workflows, predictive analytics and guaranteed application performance through autonomous operation.

24.     Concerning the employment of Michael McGuire, the Company's Chief Sales Officer, the Registration Statement noted as follows:

**Michael McGuire Offer Letter**

In 2015, we entered into an offer letter with Michael McGuire, our Chief Sales Officer. The offer letter has no specific term and provides for at will employment. Mr. McGuire's current annual base salary is $350,000, and his current annual on-target

- 8 -

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

incentive compensation opportunity is $350,000.  Pursuant to the terms of his offer letter, Mr. McGuire received an option to purchase shares of our common stock, the material terms of which are described in the "Fiscal 2017 Outstanding Equity Awards at Year-End" table.  Mr. McGuire agreed to forfeit his rights to the severance and change of control benefits under his offer letter in exchange for the right to receive severance and change of control benefits under our Executive Change of Control and Severance Policy, as more fully described in "Executive Employment Arrangements – Potential Payments upon Termination or Change of Control."

### *Potential Payments upon Termination or Change of Control*

We adopted an Executive Change of Control and Severance Policy, or the policy, for Mr. McGuire and certain other executive officers (other than Mr. Klein and Mr. Halifax) and key employees, or participants.  Under the policy, if we terminate Mr. McGuire other than for "cause," death or "disability" or he resigns for "good reason", in each case, during the period from three months prior to until twelve months following a "change of control" (for the purposes of this section "—Potential Payments Upon Termination or Change of Control," the "change of control period") (such terms are defined in the policy), he will be eligible to receive the following severance benefits (less applicable tax withholdings): (i) a lump sum cash amount equal to twelve months of his then-current annual base salary (or in the case that he resigns for good reason based on a material reduction in base salary and if greater, the annual base salary in effect prior to such reduction) or if greater, at the level in effect immediately before the change of control; (ii) 100% of his then outstanding and unvested equity awards will become fully vested and exercisable, if applicable, and any applicable performance goals will be deemed achieved at 100% of target levels; (iii) a lump sum cash amount equal to 100% of his target annual bonus opportunity in effect for the fiscal year in which the termination occurs; and (iv) payment or reimbursement of continued health coverage for him and his dependents under COBRA for a period of up to twelve months, or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

Further, under the policy, if Mr. McGuire is terminated other than for cause, death or disability any time other than during the change of control period, he will be eligible to receive the following severance benefits (less applicable tax withholding): (i) continuation of his then-current annual base salary for six months following his termination date (increasing to twelve months if the termination date follows the completion of this offering); and (ii) payment or reimbursement of continued health coverage for him and his dependents for a period of up to six months (increasing to twelve months if his termination date follows the completion of this offering), or a taxable lump sum payment in lieu of such payment or reimbursement, as applicable.

To receive the severance benefits upon a qualifying termination, Mr. McGuire must sign and not revoke our standard separation agreement and release of claims within the timeframe set forth in the policy.  If we discover after he receives severance benefits that grounds for terminating him for cause existed, he will not receive any further severance benefits under the policy, and to the extent permitted by law, he will be required to repay to us any severance benefits (or gain from such benefits) he received under the policy.

If any of the payments provided for under the policy or otherwise payable to Mr. McGuire would constitute "parachute payments" within the meaning of Section 280G of the Internal Revenue Code and would be subject to the related excise tax under Section 4999 of the Internal Revenue Code, then he will be entitled to receive either full payment of benefits or such lesser amount which would result in no portion of

- 9 -

1    the benefits being subject to the excise tax, whichever results in the greater amount of
2    after-tax benefits to him.  The policy does not require us to provide any tax gross-up
     payments to Mr. McGuire or any other participant.

3        25.    Concerning revenue growth, the Registration Statement stated that the Company has

4    "experienced *rapid revenue growth* resulting from the sales of our products and related support and

5    maintenance offerings." The Prospectus addressed the "*significant revenue growth*" the Company was

6    experiencing, stating, in pertinent part, as follows:

7            ***We have experienced significant revenue growth, with revenue increasing
            from $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016 and to $125.1 million
8           in fiscal 2017, representing year-over-year growth of 73% and 45%,*** respectively, for
            our two most recent fiscal years.  Our revenue increased from $22.9 million in the three
9           months ended April 30, 2016 to $30.4 million in the three months ended April 30, 2017,
            representing period-over-period growth of 33%.  Our net loss was $69.7 million, $101.0
10          million, and $105.8 million in fiscal 2015, 2016, and 2017, respectively, and $30.8
            million and $30.7 million in the three months ended April 30, 2016 and 2017,
11          respectively.  We have funded our activities primarily through debt and equity
            financings.  As of April 30, 2017, we had an accumulated deficit of $376.0 million.

12       26.    Concerning the "increases [in] sales coverage and effectiveness," the Registration
13
     Statement states that the Company's "*sales teams have become more productive*" and that "*ramped*
14
     *teams, which we define as sales teams who have been in their role for more than 180 days,* have
15
     increased from 34 as of January 31, 2015 to 52 as of January 31, 2016 to 54 as of January 31, 2017 to
16
     56 as of April 30, 2017."
17
         27.    Further, the Registration Statement made the following comparisons as to revenue
18
     growth at the Company in stating as follows:
19
            **Comparison of the Three Months Ended April 30, 2016 and 2017**
20
            ***Revenue***
21
                               *        *        *
22
            Total revenue increased by $7.5 million, or 33%, from $22.9 million in the three
23          months ended April 30, 2016 to $30.4 million in in [sic] the three months ended April
            30, 2017.
24
                               *        *        *
25
            Sales and marketing expense increased by $2.5 million, or 10%, from $25.0
26          million in the three months ended April 30, 2016 to $27.5 million in the three months
            ended April 30, 2017.  The increase in sales and marketing expense was primarily due to
27          increased sales commission and travel expenses of $1.4 million as a result of increased
            sales and expanded sales and marketing activities.  In addition, as part of our efforts to
28          penetrate and expand in global markets, the cost of our marketing activities, including

field events, advertising, tradeshows, brand awareness, demand generation and other expenses, collectively accounted for $0.8 million of the increase.

\* \* \*

**Comparison of the Fiscal Years Ended January 31, 2016 and 2017**

*Revenue*

\* \* \*

Total revenue increased by $39.1 million, or 45%, from $86.0 million fiscal 2016 to $125.1 million in fiscal 2017.

\* \* \*

**Comparison of the Fiscal Years Ended January 31, 2015 and 2016**

*Revenue*

\* \* \*

Total revenue increased by $36.2 million, or 73%, from $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016.

\* \* \*

Sales and marketing expense increased by $32.9 million, or 60%, from $55.1 million in fiscal 2015 to $88.0 million in fiscal 2016. The increase in sales and marketing expense was primarily driven by higher personnel costs of $11.1 million due to a 39% headcount increase. Sales commission and travel expenses increased by $10.0 million due to increased sales, higher sales and marketing activities, and overhead costs increased by $4.7 million, primarily driven by depreciation of equipment in our sales demonstration program that we initiated at the start of fiscal 2016. In addition, as part of our efforts to penetrate and expand in global markets, the cost of our marketing activities, generally including field events, advertising, tradeshows, brand awareness, demand generation and other expenses, collectively accounted for $6.3 million of the increase.

28.     However, while the Registration Statement purported to contain certain "warnings" that could make the investment in Tintri stock risky, those *risk disclosures were themselves false and misleading*. For example, the Prospectus stated:

> *If we are unable to attract and retain qualified personnel, our business and operating results could suffer.*
>
> Our future success also depends on our ability to continue to attract, integrate and retain highly skilled personnel, especially skilled sales and engineering employees. Competition for highly skilled personnel is frequently intense, especially in the San Francisco Bay Area where we are headquartered. We compete with many larger and better funded organizations both inside and outside of the storage industry for skilled personnel, and we may be unable to compete with the compensation and other benefits that these organizations offer to attract candidates and retain existing personnel.

- 11 -

Volatility or declines in our stock price may also affect our ability to attract and retain key employees. . . .

We cannot assure you that we will be able to successfully attract or retain qualified personnel. Any failure to successfully attract, integrate or retain qualified personnel to fulfill our current or future needs may negatively impact our growth and adversely affect our business, operating results and financial condition.

\*       \*       \*

***If we do not effectively expand and train our sales force, we may be unable to increase our revenue and our business will be adversely affected.***

Although we have a channel sales model, our sales representatives typically engage in direct interaction with our prospective customers. Therefore, we continue to be substantially dependent on our sales force to obtain new customers and sell additional solutions to our existing customers. As such, we have invested and will continue to invest substantially in our sales organization. Competition for sales personnel with the skills and technical knowledge that we require is intense and our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training and retaining sufficient numbers of sales personnel to support our growth.

As a result of our recent growth, a large percentage of our sales force is new to our company and therefore less effective than our more seasoned sales personnel. New hires require significant training and may take significant time before they achieve full productivity; we estimate based on past experience that sales team members typically do not fully ramp and are not fully productive during the first several quarters of employment with us. Our recent hires and planned hires may not become productive as quickly as we expect. Furthermore, hiring sales personnel in new countries requires additional set up and upfront costs that we may not recover if the sales personnel fail to achieve full productivity. If we are unable to hire and train sufficient numbers of effective sales personnel, or the sales personnel are not successful in obtaining new customers or increasing sales to our existing customer base, our business, operating results and financial condition will be adversely affected.

\*       \*       \*

***We rely on our key technical, sales and management personnel to grow our business, and the loss of one or more key employees could harm our business.***

Our success and future growth depends to a significant degree on the skills and continued services of our key technical, sales and management personnel. In particular, we are highly dependent on the services of Ken Klein, our Chairman and Chief Executive Officer, and Kieran Harty, our co-founder and Chief Technical Officer, who are critical to the development of our technology, future vision and strategic direction. We rely on our leadership team in the areas of operations, security, marketing, sales, support and general and administrative functions, and on individual contributors on our research and development team. All of our employees are employed by us on an at-will basis, and we could experience difficulty in retaining members of our senior management team or other key personnel. We do not have "key person" life insurance policies that cover any of our officers or other key employees. The loss of the services of any of our key employees could disrupt our operations, delay the development and introduction of our solution and negatively impact our business, operating results and financial condition.

29.     The statements referenced above in ¶¶22-28 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts that existed at the time of the IPO:

(a)     Defendants knew or should have known that its sales force was the critical ingredient in the Company's revenue growth, as its sophisticated sales force had driven Tintri's impressive revenue growth as a private entity;

(b)     Defendants knew or should have known that the loss of key employees, particularly within its sales force, would cause significant harm to the Company and impede its revenue generation;

(c)     Defendants knew or should have known that the Company's strong sales force was about to be destroyed since defendants were unwilling to compensate its Chief Sales Officer, and that it was nearly certain that he would leave the Company imminently;

(d)     Defendants knew or should have known that the loss of the Company's Chief Sales Officer would result in many other top sales people leaving as well, as they had loyally worked under him during their employment at Tintri;

(e)     Defendants knew or should have known that, without McGuire driving the sales force as he had in the past, Tintri could not generate as much revenue as it had in the past, and certainly not in the short term, while defendant Klein tried to spearhead and build an entirely new sales department;

(f)     As such, defendants knew or should have known that Tintri's financial projections and expectations were not achievable given the sales force disruption defendants knew or should have known was coming; and

(g)     As a result of the foregoing, at the time of the IPO, the Company's business and financial prospects were not what defendants had led the market to believe they were in the Registration Statement.

30.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not

1  misleading, and was not prepared in accordance with the rules and regulations governing its
2  preparation.

3      31.     Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related
4  interpretive releases thereto, issuers are required to disclose events or uncertainties, including any
5  known trends, that have had or are reasonably likely to cause the registrant's financial information not
6  to be indicative of future operating results. At the time of the IPO, unbeknownst to investors, Tintri was
7  experiencing upheaval in its sales organization. The adverse events and uncertainties associated with
8  these negative trends were reasonably likely to have a material impact on Tintri's profitability, and,
9  therefore, were required to be disclosed in the Registration Statement, but were not.

10     32.     On or about August 22, 2017, Tintri lowered revenue and earnings per share ("EPS")
11 estimates to account for risks associated with the sales reorganization at the Company. The Company
12 belatedly told investors that *Tintri's Chief Sales Officer had left the Company* and *that its sales*
13 *organization had flattened*.

14     33.     On September 7, 2017, *merely two months after its IPO*, Tintri reported its financial
15 results for its second quarter fiscal 2018 ended July 31, 2017, and disclosed revenue had come in at the
16 low end of its expectations. It was not until analysts questioned defendants on the Company's earnings
17 conference call later that day, however, until the remainder of the adverse facts facing the Company
18 were disclosed.

19     34.     The price of Tintri common stock plummeted as the market learned, following the IPO,
20 that the Company's business metrics and financial prospects were not as strong as represented in the
21 Registration Statement.

22     35.     On the Company's earnings conference call that took place after the close of the market,
23 defendants blamed their abysmal results on *"distraction, disruption"* and *"sales attrition . . . during*
24 *and after [the] IPO."* Indeed, the Company conceded that they had flattened their sales organization
25 following the departure of the Company's Chief Sales Officer, and *now had to increase Tintri's focus*
26 *on "sales retention, training and enablement* as we launch our new product offerings."

27     36.     Defendants had numerous exchanges with analysts during the September 7, 2017
28 earnings call, all of which make clear that securities analysts, like the investing public, had a very

1 difficult time understanding the Company's current financial results and future expectations given all of

2 the positive representations about the Company's substantial growth in its Registration Statement. In

3 pertinent part, those exchanges were as follows:

**Jason Ader**

Yes, thanks. I know you haven't given guidance for Q4, just talked about some improving momentum toward the end of the year here. But if I roll through Q3 to Q4 and I assume some type of reasonable growth from Q3 to Q4 it's still going – *it's like almost no growth year-over-year. How should we be thinking about the growth profile of the business at this point, I mean, you had talked about pre-IPO, like a 30% type growth. Obviously that is not going to be the case to the second half of the year and probably not in the first half of next year given the comps.* So maybe just first, how do we think about growth at this point and then what has really changed to cause growth to stall out here.

**Ian Halifax**

Let me take the first part of that question if I may Jason, its Ian speaking. So obviously the Q2 revenue was slightly lower than we hoped and Ken commented in his prepared remarks. *As a result we're just been very focused on closing our guidance for Q3 and I wouldn't expect to see a strong return to growth in Q4.* But for now we're simply guiding through the end of Q3, I'll break guidance for Q4 onto next quarter and then provide full year guidance for next year – at the end of the fiscal year.

**Jason Ader**

Okay. *That didn't really answer my question.* I guess I'm trying to understand what – I know you're trying to be cautious because you had a weaker than expected Q2. But unless you're going to see like a dramatic pickup in the business I guess. What would cause a dramatic pickup in the business? And then maybe why – *why are things – I know you talked about the IPO but is there something else that's changed* – the product cycle have a bigger impact, kind of ending of this product cycle before the new product cycle have a bigger impact than you expected what are other things going on here that have caused this sort of reset.

**Ken Klein**

Yes, Jason. It's Ken. How are you? So *the IPO actually had a profound impact on our business* as I mentioned in my prepared remarks it definitely caused *distraction, disruption and some unwanted attrition particularly in the sales force.* And so, as mentioned I've taken over, taking really the necessary steps to get it back on the right sort of growth trajectory platen the organization. I'm focusing on sales processes, improving productivity and I have a really strong team reporting, Mr. Tom Ellery, running North America as X- EMC, Brocade and Tom Cashman running rest of world and Alliance of X-IBM.

So the guidance is really just fundamentally due to taking a cautious posture given what we experienced in Q2.

\*       \*       \*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Katy Huberty**

Yes. Thank you for taking the questions. *You released in a K when the Chief Sales Officer left, but I wonder if you could provide some color as to how many quota carrying sales reps you have? I think last quarter it was 70, did you also see some turnover in that base.* Because I guess we're trying to reconcile a strong customer add number, I think you added 127 customers versus 90 the prior few quarters. You're talking about strong land and expand. And so the metrics in the business look okay, *but you're guiding revenue down 15% in October. I was just trying to understand what might be going on in the sales force beyond the head of that business leaving?* Thanks.

**Ian Halifax**

Let me take the first part, okay. So we're not going to disclose the absolute number of sales teams or ramp sales team. What I can tell you that we did lose a small number of ramp sales team but having said that, the yield – the average yield per ramp team actually increased 33% year-over-year, so that we think is pretty healthy.

**Ken Klein**

Yes. And then in terms of customer adds Katy, we added approximately 88 net new logos in the quarter. So it was pretty consistent with – sort of the customer totals that we've experienced in previous quarters. And we have some nice new logos including we added Fox as a new customer, Bechtel, Volkswagen and Salvation Army are pleased with those adds.

**Katy Huberty**

And then just as a follow-up, *does that 33% increase in average yield per ramp team does that include the contribution from some of the people that left during the quarter?* And then just as a connected question to that why are you so confident that you can drive increased sales productivity to deliver growth whereas a lot of your other competitors in the emerging storage space are having to hire aggressively in order to deliver their growth. Why do you think Tintri is different? Thank you.

**Ian Halifax**

Thanks Katy. This is Ian. *The first part of the question there were some sales people, probably who were included in that 33%, yield number I gave you. So the answer now is yes.* Second part is we're very focused on our land and expand model. As you can see the land and expand multiplier went to 21x last quarter from 19x. So we believe that fundamentally we align the right enterprise account and expand there, we don't need to darken the skies with new sales people.

\*   \*   \*

- 16 -

**Wamsi Mohan**

Yes. Thank you. *What's your plan to add new sales teams and are you changing that I mean given the fact that your revenue trajectory looks materially different at least for the next quarter.* What are you putting in place in terms of ramping because it also sounded as though you are going to cautiously manage your expenses? *So are you putting expansion of sales teams on hold at the moment?*

**Ken Klein**

It's Ken. *It's really a balancing act* obviously where we see a TAM that we can access will add new teams. I'd say, that we're biased more toward productivity again as I mentioned I really flattened the organization, really three strong leaders here including a sales ops function as well. And we're very much focused on driving productivity because productivity is really going to be the key they gets us toward our cash and profitability goals in the longer-term. So we're focusing on – primarily on things like sales process and really optimizing organization, kind of how we're doing things, how we're working with the channel and those sorts of things as opposed to just blindly adding teams.

**Wamsi Mohan**

Okay. Thanks. As a follow-up, in your guidance *can you help us parse through what your assumptions are so we can try to disaggregate what might be more transitory disruption around IPO and leaving your sales head versus anything much more structural?* Can you help us think through within the guidance what sort of repeat purchases are you accounting for is there a significant change in the deal size existing or new customers that you're embedding and acquisition of new customers. If you can help us think through these different pieces what your assumptions are embedded within your guidance I think it will be helpful to sort of characterize what is transitory versus not?

**Ken Klein**

I'll try to take a swag and I'll let Ian follow-up. So it is really difficult to quantify last quarter, I mean – *clearly retention bid [sic] us to certain degree but there was a fair amount of disruption and distraction*, which is in fact transitory, so we believe we really stabilized the organization. And we've kind of move beyond a very difficult IPO. Again, as I mentioned, we installed very, very strong leaders in North America and in rest of world to really manage the business. And I'll turn the rest of the question over to Ian.

\* \* \*

**Alex Kurtz**

Just a question for Camellia jump here at another potential disruption would be down the road kind or *if you guys decided to bring in as head of global sales to replace Mike and that could lead to another attrition like event.* Can you say right now that you really believe that, that's not the path forward here in the next 24 to 36 months that the current shot here is what it is and that you're moving forward with.

**Ken Klein**

I can tell you that unless I like that and *I have no plans at this time to change the structure from the one that I just created.* Again, just to reiterate, I thought I'd have a very strong team Ian, both Tom Ellery and Tom Cashman and Ben Taft around sales operations really supporting me and that's just as a reminder, I've run companies from the past add billion dollars from scale from sales perspective. So it's not something that's far into me and actually it's provided a unique opportunity to really align ourselves the field with headquarters and headquarters of field are more – closely, more tightly and again that alignment, I'm already seeing the signs of driving sort of faster velocity in terms of decision making and I expect to see improved execution. So I'm comfortable with the organization the model we have in place.

37.     The price of Tintri common stock has since plummeted and now trades in the range of $4 per share, *or approximately 40%* below the price the stock was sold at in the IPO.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action on behalf of all those who purchased Tintri common stock pursuant or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tintri or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    42.    Common questions of law and fact exist as to all members of the Class and predominate

2 over any questions solely affecting individual members of the Class.  Among the questions of law and

3 fact common to the Class are:

4            (a)    whether defendants violated the 1933 Act;

5            (b)    whether statements made by defendants to the investing public in the Registration

6 Statement and Prospectus misrepresented material facts about the business and operations of Tintri; and

7            (c)    to what extent the members of the Class have sustained damages and the proper

8 measure of damages.

9    43.    A class action is superior to all other available methods for the fair and efficient

10 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

11 damages suffered by individual Class members may be relatively small, the expense and burden of

12 individual litigation make it impossible for members of the Class to individually redress the wrongs

13 done to them.  There will be no difficulty in the management of this action as a class action.

14                          **FIRST CAUSE OF ACTION**

15                     **For Violation of §11 of the 1933 Act**
                     **Against Tintri, the Individual Defendants**
16                     **and the Underwriter Defendants**

17    44.    Plaintiff incorporates ¶¶1-43 by reference.

18    45.    This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on

19 behalf of the Class, against Tintri, the Individual Defendants and the Underwriter Defendants.

20    46.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue

21 statements of material facts, omitted to state other facts necessary to make the statements made not

22 misleading, and omitted to state material facts required to be stated therein.

23    47.    The defendants named in this Cause of Action are strictly liable to plaintiff and the Class

24 for the misstatements and omissions.

25    48.    None of the defendants named herein made a reasonable investigation or possessed

26 reasonable grounds for the belief that the statements contained in the Registration Statement were true

27 and without omissions of any material facts and were not misleading.

28

1      49.    By reason of the conduct herein alleged, each defendant named herein violated, and/or

2  controlled a person who violated, §11 of the 1933 Act.

3      50.    Plaintiff acquired Tintri common stock in the IPO.

4      51.    Plaintiff and the Class have sustained damages.  The value of Tintri common stock has

5  declined substantially subsequent to and due to these defendants' violations.

6      52.    At the time of their purchases of Tintri common stock, plaintiff and other members of the

7  Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could

8  not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has

9  elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon

10  which this complaint is based to the time that plaintiff commenced this action.  Less than three years

11  has elapsed between the time that the securities upon which this Cause of Action is brought were

12  offered to the public and the time plaintiff commenced this action.

13                                  **SECOND CAUSE OF ACTION**

14                      **For Violation of §12(a)(2) of the 1933 Act**
                       **Against Tintri, the Executive Defendants,**

15                         **and the Underwriter Defendants**

16      53.    Plaintiff incorporates ¶¶1-52 by reference.

17      54.    By means of the defective Prospectus, defendants Tintri, the Executive Defendants and

18  the Underwriter Defendants promoted and sold Tintri stock to plaintiff and other members of the Class.

19      55.    The Prospectus contained untrue statements of material fact, and/or concealed or failed

20  to disclose material facts, as detailed above.  The defendants named in this Cause of Action owed

21  plaintiff and the other members of the Class who purchased Tintri common stock pursuant to the

22  Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the

23  Prospectus to ensure that such statements were true and that there was no omission to state a material

24  fact required to be stated in order to make the statements contained therein not misleading.  These

25  defendants, in the exercise of reasonable care, should have known of the misstatements and omissions

26  contained in the Prospectus as set forth above.

27

28

56.     Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time plaintiff acquired Tintri common stock.

57.     By reason of the conduct alleged herein, these defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Tintri common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Tintri stock. Accordingly, plaintiff and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

### THIRD CAUSE OF ACTION

**For Violation of §15 of the 1933 Act
Against Tintri, the Venture Capital Defendants
and the Individual Defendants**

58.     Plaintiff incorporates ¶¶1-57 by reference.

59.     This Cause of Action is brought pursuant to §15 of the 1933 Act against Tintri, the Venture Capital Defendants and the Individual Defendants.

60.     The Individual Defendants each were control persons of Tintri by virtue of their positions as directors and/or senior officers of Tintri. Each of the Venture Capital Defendants controlled Tintri by their voting and dispositive control over greater than 20% of Tintri's outstanding voting shares and pre-IPO shareholder agreements. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Tintri. The Venture Capital Defendants were control persons of Tintri by virtue of their ownership of Tintri stock and their rights to force Tintri to register that stock for resale. Tintri controlled the Individual Defendants and all of its employees.

61.     The Venture Capital Defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of the Venture Capital Defendants' investment in Tintri. Tintri, the Venture Capital Defendants and the Individual Defendants were each

1  critical to effecting the IPO, based on their signing or authorization of the signing of the Registration

2  Statement, by voting (including voting their shares) to execute the IPO, and by having otherwise

3  directed through their authority the processes leading to execution of the IPO.

**PRAYER FOR RELIEF**

5      WHEREFORE, plaintiff prays for relief and judgment, as follows:

6      A.      Determining that this action is a proper class action, certifying plaintiff as a Class

7  representative under California Rule of Court 3.764 and California Code of Civil Procedure §382, and

8  plaintiff's counsel as Class counsel;

9      B.      Awarding compensatory damages in favor of plaintiff and the other Class members

10 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

11 wrongdoing, in an amount to be proven at trial, including interest thereon;

12     C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

13 action, including counsel fees and expert fees;

14     D.      Awarding rescission or a rescissory measure of damages; and

15     E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

17     Plaintiff hereby demands a trial by jury.

18 DATED: September 20, 2017                ROBBINS GELLER RUDMAN
                                           & DOWD LLP
19                                         JAMES I. JACONETTE

20

21                                         JAMES I. JACONETTE

22

23                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101
24                                         Telephone:  619/231-1058
                                           619/231-7423 (fax)

25                                         ROBBINS GELLER RUDMAN
                                           & DOWD LLP
26                                         SAMUEL H. RUDMAN
                                           58 South Service Road, Suite 200
27                                         Melville, NY  11747
                                           Telephone:  631/367-7100
28                                         631/367-1173 (fax)

- 22 -

1

2

3

4

5

6   I:\Admin\CptDraft\Securities\Cpt Tintri Inc.docx

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLZER & HOLZER LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiff

- 23 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

James I. Jaconette (179565)
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
TELEPHONE NO.: 619/231-1058    FAX NO.: 619/231-7423
ATTORNEY FOR *(Name):* Plaintiff Laurence Clayton

**FILED**
SAN MATEO COUNTY
SEP 20 2017
Clerk of the Superior Court
DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
STREET ADDRESS: 400 County Center, 4th Floor
MAILING ADDRESS:
CITY AND ZIP CODE: Redwood City, CA 94063
BRANCH NAME: Hall of Justice and Records

CASE NAME:
Clayton v. Tintri, Inc., et al.

**File By Fax**

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: 17CIV04312 |
|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant *(Cal. Rules of Court, rule 3.402)* | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary  b. ☑ nonmonetary; declaratory or injunctive relief  c. ☐ punitive
4. Number of causes of action *(specify):* Three
5. This case ☑ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 20, 2017

James I. Jaconette
(TYPE OR PRINT NAME)                              ► (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court...<br>Cal. Sta... |
|---|---|---|

17 - CIV - 04312
CCCS
Civil Case Cover Sheet
722494

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition